**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

TODD RUELLE, an individual; SUMMIT COUNTY RESORT
HOMES INC., a Colorado nonprofit corporation;

      Plaintiffs,

  v.

SUMMIT COUNTY BOARD OF COUNTY
COMMISSIONERS; ELISABETH LAWRENCE, in her
Official Capacity as a Commissioner;
TAMARA POGUE, in her Official Capacity as a
Commissioner; and JOSHUA BLANCHARD, in
his Official Capacity as a Commissioner,

      Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### NATURE OF THE ACTION

Summit County, Colorado—the site of four world-class ski resorts and an abundance of

federal, state, and local open lands, trails, lakes, and streams—has been a place where Colorado

residents and out-of-state tourists flock to recreate. For decades, many of these visitors have rented

Summit County homes for short-term stays, rather than stay in hotels. Such short-term rentals

("STRs")[1] provide accommodations for visitors who prefer a residential environment and provide

---

[1] Summit County regulations define an STR as "a residential dwelling unit, or any room therein,
available for lease or exchange for a term of less than thirty (30) consecutive days." Summit
County, Colorado, Ordinance 20-C, § 1.1(b) (2023).

a supplemental source of income for homeowners, many of whom rely on that income to pay for their mortgages or for other basic needs.

This action arises out of the Summit County Board of County Commissioners' ("BOCC") blunderbuss response to STRs. In an effort to reduce the number of STRs in the County, the BOCC imposed successively more severe, wide-ranging, misguided, and unlawful regulations only on portions of residences in the County without first assessing whether the previously enacted, less stringent measures were adequate to remedy the perceived ills of STRs.

Under the current regime, all County property owners must obtain a license from the County to engage in STRs. But certain residences may still be used for STRs unimpeded, while much of the County—where use of residences as STRs has occurred for decades—is subject to:

- Severe limits on the number of STR bookings for which each homeowner may contract;

- Caps on the number of STR licenses;

- Prohibitions on transferring STR licenses to home buyers;

- Limits on occupancy within each home used for STRs;

- Qualified-occupancy standards that are nonsensical and discriminate against out-of-state owners of County homes;

- Requirements to have 24/7 management available to address neighbor complaints; and

- Many other constraints.

Not all these measures are illegal. In fact, certain requirements—like STR licenses and the need for local 24/7 STR management—obviate the need for many other constraints imposed on homeowners, like STR booking limits. But certain aspects of this regulatory regime go too far.

And the BOCC's justifications for its excessive STR regulations, including that STRs deprive the County of local workforce housing, are fabricated and seek to involuntarily enlist private homeowners to solve the County's failure to adequately address the workforce housing shortage. The County's line-drawing between the STR haves and have-nots is indefensible, and its impairment of historical, lawful residential uses undermines the reasonable expectations of and investments made by private homeowners who wish to exercise their private property rights to meet a growing and important community need.

In short, many of the BOCC's STR regulations, embodied in County Ordinances 20-B and 20-C, violate Plaintiff Todd Ruelle's and members of Plaintiff Summit County Resort Homes Inc.'s ("SCRH") due process and equal protection rights, as well as their rights protected by the Commerce Clause, under the United States Constitution. They also violate their statutory and constitutional rights under Colorado state law. Thus, these STR regulations that treat County homeowners differently, limit the STR bookings a homeowner can host, cap the STR licenses in the County, and prohibit the transfer of STR licenses must be declared void and enjoined.

## THE PARTIES

### *Plaintiff Todd Ruelle*

1. Plaintiff Todd Ruelle is a homeowner in unincorporated Summit County and has been for decades. He bought his home on October 10, 1980.

2. Since 1990, Mr. Ruelle has regularly rented his home as an STR. During an average year, Mr. Ruelle hosts roughly 65 STR bookings.

3. The County's STR booking limitations thus will cost Mr. Ruelle tens of thousands of dollars in lost rental income.

***Plaintiff Summit County Resort Homes Inc.***

4. SCRH is a Colorado nonprofit corporation with its principal place of business at 349 American Way, P.O. Box 2525, Breckenridge, CO 80424.

5. SCRH is organized to defend the rights of its members and other owners of residential property in Summit County, Colorado to use their residential properties as STRs.

6. SCRH's membership consists of individuals who own residential property in unincorporated Summit County, pay dues as prescribed by SCRH's Board of Directors, and are designated by SCRH as members. Each member has a right to vote on each matter submitted to a vote of the members, including, but not limited to, election of members to serve on SCRH's Board of Directors.

7. SCRH currently has three Directors, and each Director is a member of SCRH.

8. Mr. Ruelle is a Director of SCRH and is the nonprofit's President.

9. Mark Mason ("Mark") is also a Director of SCRH and serves as its Secretary.

10. Mark bought his home in unincorporated Summit County in the fall of 2005; it has been his and his family's primary residence since then.

11. He began renting his home as an STR in 2008. The home's STR rental income has helped him and his family through Mark's wife's early retirement because of medical necessity and a six-month period during which Mark could not work because of a medical complication.

12. Richard Mason ("Rich") is SCRH's third Director and serves as its Treasurer.

13. Rich owns two homes in unincorporated Summit County. He personally built both of them with help from his family.

14. In 1998, Rich bought his first lot in the County and finished construction of his first home in 2000.

15. In 2013, Rich bought the land directly next to his home to build a carriage house, completing construction in 2019. Rich began renting out his primary residence as an STR in 2016 and the carriage house in 2019.

16. The severe restrictions on the number of STR bookings an STR owner can host will have a significant financial and personal effect on Rich, costing him thousands in lost rental income and setting back his retirement plans by years.

17. As of the filing of this complaint, SCRH has 89 members, each of whom owns property in at least one of 21 neighborhoods across unincorporated Summit County.

18. SCRH has Article III standing to assert these claims on behalf of its members and other similarly situated residential property owners in the County because (a) its members own property in unincorporated Summit County that they currently rent, or wish to rent, as STRs; (b) the County's STR regulations are germane to SCRH's purpose; and (c) the claims SCRH asserts and the relief requested do not require the participation of individual members.

***The Summit County Defendants***

19. Defendant BOCC serves as the legislative and policy-setting body for the Summit County government. The County is a political subdivision of the State of Colorado and is subject to the jurisdiction and venue of this Court. At all times relevant hereto, the BOCC acted in its official capacity as a governmental body under the laws of the State of Colorado.

20. The BOCC is the proper name under which to sue Summit County, and it is considered a person under 42 U.S.C. § 1983. *See Pierce v. Delta Cnty. Dept. of Social Servs.*, 119 F. Supp. 2d 1139, 1148 (D. Colo. 2000) (adopting the "well-reasoned analysis" in *Wigger v. McKee*, 809 P.2d 999, 1003 (Colo. App. 1990), in which the court determined Arapahoe County was properly sued in the name of The Board of County Commissioners of Arapahoe County).

21. Defendant Elisabeth Lawrence is, and has at all relevant times been, a Commissioner on the BOCC, and in performing her duties is and was acting under color of law. Ms. Lawrence is being sued only in her official capacity.

22. Defendant Tamara Pogue is, and has at all relevant times been, a Commissioner on the BOCC, and in performing her duties is and was acting under color of law. Ms. Pogue is being sued only in her official capacity.

23. Defendant Joshua Blanchard is, and has at all relevant times been, a Commissioner on the BOCC, and in performing his duties is and was acting under color of law. Mr. Blanchard is being sued only in his official capacity.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction, under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and under 42 U.S.C. § 1983.

25. Under 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

26. This is also an action for declaratory judgment and injunctive relief under 28 U.S.C. § 2201 challenging the validity and constitutionality of certain Summit County STR regulations. Under 28 U.S.C. § 2201, this Court may issue a declaratory judgment on the matter.

27. The Court has supplemental jurisdiction over the Colorado state-law claims under 28 U.S.C. § 1367.

28. Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred in Colorado.

## GENERAL ALLEGATIONS

29. Summit County is a Colorado mountain county covering about 600 square miles. Its county seat is Breckenridge, Colorado. The County includes incorporated towns like Breckenridge and Silverthorne, as well as unincorporated areas.

30. The BOCC is the governing body for unincorporated Summit County. Mr. Ruelle and SCRH members own homes and other residential properties in unincorporated Summit County and, thus, are subject to the BOCC's STR regulations.[2]

31. Historically, and continuing through today, the entire County has been a premier destination for visitors seeking a getaway in Colorado's Rocky Mountains.

32. Each County neighborhood provides access to world-class skiing and snowboarding in the winter, and biking, hiking, fishing, and boating in the summer. The County's year-round outdoor attractions entice visitors from all over the country and the world. And even those not seeking adventure can enjoy this special destination. Less active visitors come to Summit County to commune with nature and experience the breathtaking views, cool summer weather, and abundant winter snowfall. These experiences are accessible from every neighborhood in the County.

33. It is no wonder that many visitors prefer staying at an STR rather than in a hotel. As STR guests have reported to SCRH members, STRs feel like a home away from home for County guests. From the extra efforts that STR hosts put in (such as personalized sightseeing recommendations and the hand warmers left for guests who are not used to the cold), to the love that the hosts pour into their homes' upkeep and décor, to the accommodations for larger families, STRs provide an appealing alternative to hotel stays.

---

[2] The regulations discussed here affect the areas of unincorporated Summit County. Towns in Summit County, such as Breckenridge, are not subject to the ordinances challenged here.

34. Indeed, SCRH members have guests whose families return every year to the same home because they have built such a connection with the area and the STR. SCRH members have even helped guests plan marriage proposals and then hosted the families' return the next year for the wedding.

35. The County community has also harnessed the benefit of these residences to serve public purposes. For example, Advocates for Victims of Assault, Inc., which is a nonprofit that provides services to survivors of domestic violence, sexual assault, and associated traumas, has consistently partnered with some SCRH members over the years. One of the services this nonprofit is able to offer due to its partnership with these SCRH members is the provision of safe overnight housing for individuals fleeing dangerous situations. If a survivor needs immediate housing, Advocates for Victims of Assault is able to connect them with STR hosts who have an open room for the night. The STR hosts provide this housing at a vastly reduced rate, often only receiving just enough to cover the STR's cleaning fee from the nonprofit.

36. As another example, Colorado State Patrollers often stay in Summit County STRs when winter storms do not allow them to travel home safely or when they are relocated to the County. STR property owners, including Mr. Ruelle, have provided their homes to patrollers at significantly discounted rates.

***For decades, STRs have been a fixture across Summit County and have supported the County's economy.***

37. Summit County's economy relies on the economic activity of STR guests.

38. Historically, boarding houses and hostels offering short-term stays fueled the development of the County. Many homeowners rented their spare rooms to guests just as SCRH members do today. Knowing the longstanding demand for this sort of lodging, nearly all SCRH members

bought their Summit County properties with the intent to rent out their homes as STRs at least part time.

39. STR guests augment County resident spending, growing the overall economic activity in the County. For instance, according to a recent industry study, in 2020, STR guests increased spending in the County by around $40,000 per County resident and generated $26.8 million in state and local taxes.

40. Summit County also had the highest portion of tourism-related jobs among its fellow Colorado mountain communities: Eagle, Grand, Pitkin, and Routt Counties.

41. In 2020, about half of all jobs in the County were in tourism-related industries, and STR-guest spending in Summit County supported 5,900 jobs, with $211.6 million in earnings.

*The County's initial regulation of STRs.*

42. Starting around 2017, the BOCC sought community input on the effects of STRs in the County.

43. Upon information and belief, in 2018, the BOCC initiated public planning and outreach sessions to develop regulations regarding STRs.

44. Unfortunately, the BOCC's public process unfairly impeded the efforts of STR supporters to voice their concerns with the proposed regulations. For example, County residents found it difficult to access recorded BOCC meetings, including because the County displayed malfunctioning hyperlinks on its website. Nor, upon information and belief, did the County record any of its work sessions where it developed the STR regulations. Also, during numerous BOCC meetings, the BOCC intentionally moved the public comment period to the end of the meeting so that those who attended were forced to sit for hours through the entire agenda to have their voices heard on STR regulations.

45. Despite the BOCC's tactics, many SCRH members were among those who remained engaged in the STR regulatory process, continually attempting to have their voices heard at BOCC meetings or through emails sent to the Commissioners and BOCC staff members. Again, however, their voices were ignored by the County, which relied instead on self-serving, paid STR studies and manipulated survey data to impose unlawful STR restrictions.

46. December 2018 was the first time the BOCC sought to regulate STRs. The regulations required STR owners to apply for an STR permit by June 1, 2019.

47. The permitting system also added certain rules for STRs. The new system:

    a. Imposed occupancy restrictions;

    b. Required property owners devise plans for parking and trash disposal at the property during STRs;

    c. Mandated the identification of a responsible agent for the property, should STR guests or the County require a readily accessible point of contact; and

    d. Made the permits nontransferable, requiring a new owner of an STR to renew the permit upon transfer of title.

48. *But the permit system imposed no caps on the number of properties that could be used for STRs and no booking limits.* So any homeowner in the County could obtain an STR permit and have as many STR bookings as they would like.

49. At that time, and at all times relevant to the current proceedings, Summit County also had an ordinance restricting nuisances caused by noise, County code provisions addressing building occupancy limits, and requirements for trash clearing and collection. These provisions applied then and apply now throughout the County to all homeowners and visitors, including to any STR property owners and guests.

50. On March 23, 2020, Colorado Governor Jared Polis signed into law House Bill 20-1093. This bill, effective September 17, 2020, amended C.R.S. § 30-15-401 to authorize the boards of

county commissioners across the state to license and regulate STRs. This law, however, does not authorize Colorado boards of county commissioners to disregard property owners' constitutional and statutory property rights. Yet Summit County's BOCC has done just that.

51. Right after the state-wide legislative change, the BOCC directed its staff to develop a plan to transition from an STR permitting scheme to a licensing one.

52. Summit County Ordinance 20 ("Ordinance 20") accomplished this transition from STR permits to STR licenses.

53. The first reading of Ordinance 20 occurred at a BOCC meeting in May 2021.

54. The BOCC publicly stated that little of the STR regulatory scheme's substance would change with the passage of Ordinance 20. It repeatedly emphasized that converting from STR permits to licenses would give the County better enforcement tools.

55. With permits, the County had to undergo extensive notice procedures and could not levy a fine on a violator without a court order. But with licenses, the BOCC explained, the County could immediately levy a fine for an STR violation that is enforceable by the County Sheriff's Office. Additionally, the County could more easily revoke an STR license for violations through an administrative process, as compared to a court proceeding for revoking a permit.

56. The BOCC adopted the migration to STR licensing under Ordinance 20 at its June 21, 2021 meeting. A true and correct copy of Ordinance 20 is attached as **Exhibit 1**.

57. While Ordinance 20 went into effect on its passage, existing STR permit holders had until September 30, 2021, to convert their permit to a license. *Like with the permit scheme, Ordinance 20's licensing scheme imposed no limits on the number of STR bookings and no caps on the number of STR licenses available in unincorporated Summit County.*

*The County's Moratorium on New STRs and the Adoption of Ordinance 20-B .*

58. On September 14, 2021, before the new licensing scheme had fully gone into effect—a change the BOCC touted as the solution to better police STRs—the BOCC approved a 90-day moratorium on issuing STR licenses, effective September 18, 2021.

59. A September 14, 2021 memorandum from County Planning Department staff to the BOCC stated that "[t]he purpose of the moratorium is to address the local workforce housing crisis" by temporarily pausing the issuance of new STR licenses "to allow staff time to develop and propose amended STR regulations." Yet the BOCC instituted this moratorium before giving the newly enacted STR licensing scheme, Ordinance 20, a chance to have (or for the BOCC to witness) its intended salutary effect.

60.  A mere two months after the transition from STR permits to licenses under Ordinance 20, the BOCC introduced another set of more stringent STR regulations: Summit County Ordinance 20-B ("Ordinance 20-B").

61. Ordinance 20-B created "Overlay Zones" that distinguish between areas of unincorporated Summit County that are "resort areas" versus those that are "neighborhood areas." The two overlay zones—the Resort Overlay Zone ("ROZ") and the Neighborhood Overlay Zone ("NOZ")—are also codified in Chapter 4 of the County's Land Use and Development Code.

62. While Chapter 4 expressly designates by name certain County areas as ROZ, it defines the NOZ merely as areas that are not ROZ: "The STR Neighborhood Overlay Zone encompasses the remainder of unincorporated Summit County Outside of the STR Resort Overlay Zone." Summit County, Colorado, Land Use and Dev. Code ch. 4 § 4302 (2021).

63. How the County classifies a residential property—ROZ or NOZ—dictates the STR rules that apply to the property. And those rules vary greatly depending on the classification, from the

ability to host as many STR bookings as you want, to not being able to host guests as an STRs at all.

64. The BOCC claims that properties in the ROZ were developed specifically to accommodate vacationing tourists, while properties in the NOZ were not. The BOCC is wrong. In reality, the fabricated overlay zones are distinctions without a difference.

65. Despite there being no meaningful differences between the areas classified NOZ versus ROZ, under Ordinance 20-B, the BOCC imposed STR restrictions in the NOZ, while leaving the ROZ unaffected.

66. Ordinance 20-B created three types of NOZ STR licenses:

a. *Type I License*: To receive a Type I license, the relevant STR had to be the property owner's primary residence—that the owner occupied at least nine months of the year. If the property owner was at the property during the STR rental periods, the Ordinance imposed no maximum on the number of nights for which the STR could be rented. But if the owner was absent during the bookings, the STR could be rented only for up to 60 nights total, as calculated from October 1 through September 30.

b. *Type II License*: Any homeowner in the NOZ could apply for a Type II license, but the BOCC capped the total nights per year for which an STR could be booked at 135 nights.

c. *Type III License*: These licenses had no limits on the number of nights a property could serve as an STR, but property owners had to be first approved through the Conditional Use Permit process.

67. Additionally, for every STR in the NOZ, Ordinance 20-B decreased the occupancy limits to two guests per bedroom, plus two additional guests. Starting with the County's permitting

system and continuing through Ordinance 20, occupancy limits had been set at two guests per bedroom, plus four other occupants.

68.  On December 16, 2021, a mere month after introducing Ordinance 20-B and after allowing nearly no time for public comment, the BOCC signed Ordinance 20-B into law. A true and correct copy of Ordinance 20-B is attached as **Exhibit 2**.

69. For those property owners in the NOZ who already held STR licenses, Ordinance 20-B's regulations did not go into effect until September 30, 2025. Thus, to a degree, the County exempted from compliance with Ordinance 20-B, for a period of time, those homeowners already holding an STR license—but only those owners.

***With Ordinance 20-C, the BOCC again further restricts STR property owners before allowing its prior regulations to take meaningful effect.***

70.  In May 2022, six months after the adoption of Ordinance 20-B, the BOCC enacted a second moratorium on the issuance of STR licenses in the NOZ. This time it was a nine-month moratorium.

71.  Yet again, the BOCC billed the moratorium as an opportunity to give BOCC staff more time to propose *additional* regulations for STRs within the County on only some property owners.

72. And yet again, SCRH members fought to have their voices heard by their County representatives and protect their rights to rent their homes as STRs. But the County would not listen.

73. For example, Mr. Ruelle attended various BOCC meetings where the County addressed its proposed STR regulations, including a meeting on January 24, 2023. At that meeting, the County introduced its desire to impose STR booking limitations for NOZ properties. But the County refused to hear public comment on its proposed booking limitations despite concerned owners' requests to be heard.

74. After the BOCC refused to listen to STR property owners, Mr. Ruelle approached Mr. Jeffrey Huntley, the County Attorney, and asked for a minute of his time to discuss the STR regulations. Mr. Huntley refused to speak with Mr. Ruelle. When Mr. Ruelle continued his appeal to speak with Mr. Huntley by saying he is a taxpayer, Mr. Huntley responded "I don't give a damn." He then shut the door to his office in Mr. Ruelle's face. This episode is emblematic of the County's and its leaders' disregard for property owners' rights.

75. The BOCC's rapid-fire accumulation of restrictions on the use of private property resulted in arbitrary STR regulations, as prior provisions were not given time to take effect. And the County was not interested in listening to any feedback to the contrary. It had a goal to limit STRs, and it planned to achieve that goal whether property owners liked it or not.

76. Less than a month after first proposing the NOZ STR booking limitations, the BOCC adopted Summit County Ordinance 20-C on February 15, 2023. Ordinance 20-C is the culmination of the BOCC process to limit STRs and represents further encroachment on property owners' rights to lease their properties. A true and correct copy of Ordinance 20-C is attached as **Exhibit 3**.

77. Ordinance 20-C upended the anticipated regulatory scheme before the regulations in Ordinance 20-B had fully gone into effect. It also sped-up the implementation of this new regime. Ordinance 20-C's key features violate Mr. Ruelle's, SCRH members', and similarly situated County property owners' rights.

**a. Preferential treatment of "Qualified Occupants" is irrational and discriminatory.**

78. Under Ordinance 20-C, there are only two types of STR licenses that apply to properties in the NOZ: *Type I* and *Type II* licenses.[3]

79. There is no cap on the number of available Type I STR licenses in the NOZ. But that is not the case for Type II licenses. Ordinance 20-C imposed strict caps on the number of Type II licenses allowed within each of the County's four basins.

80. For a property owner in the NOZ to obtain a Type I license, and thus avoid the NOZ license caps, a "Qualified Occupant" must live in the home. And only that "Qualified Occupant" can engage in STRs.

81.  Under Ordinance 20-C, a Qualified Occupant must not only designate the home they use as an STR as their primary residence, they also must work an average of 30 hours per week, annually, for "a business or organization operating in and serving Summit County, which requires [the individual's] physical presence within the boundaries of Summit County in order to complete the task or furnish the service." Ordinance 20-C, § 1.1(d).

82. Individuals who are self-employed or work from home and want to satisfy the Qualified Occupant threshold must show that the business they operate or for which they work is located within and serves Summit County and that the individual's physical presence is *required* within Summit County. *Id.* § 1.1(d)(i).

83. Ordinance 20-C's definition of "Qualified Occupant" means that an out-of-state resident cannot be one.

---

[3] Type III licenses, which were available under Ordinance 20-B, will automatically convert to Type II licenses upon renewal in September 2023. No new Type III licenses will be issued under Ordinance 20-C.

84. A County resident who is now retired also cannot be a Qualified Occupant. "Qualified Occupants may be authorized to retire," but that assumes that the individual is already a Qualified Occupant. *Id.* § 1.1(d)(ii).

85. The "Qualified Occupant" exception to the STR licensing caps in the NOZ is arbitrary, overly burdensome, unnecessarily restrictive, and unlawful.

> **b. Caps on Type II STR licenses in the NOZ are arbitrary and discriminatory.**

86. Ordinance 20-C does not cap the number of STR licenses available in the ROZ.

87. But in the NOZ, a property owner's eligibility for a Type I versus a Type II STR license determines whether they can even apply for a license, let alone get one.

88. Again, Type I STR licenses are not capped.

89. Type II STR licenses are capped per basin in NOZ areas under the following distribution:

   a. *Lower Blue Basin*: 550 licenses (or about 15% of properties could obtain a license);

   b. *Snake River Basin*: 130 licenses (or about 5% of properties could obtain a license);

   c. *Ten Mile Basin*: 20 licenses (or about 6% of properties could obtain a license); and

   d. *Upper Blue Basin*: 590 licenses (or about 18% of properties could obtain a license).

90. Each of these caps is set at a lower number than the current number of STR licenses in each basin.

91. While the BOCC has stated it will not pull STR owners' current licenses, it plans to meet these caps through attrition, prohibiting the transfer of STR licenses, and denying new applications for STR licenses. Meanwhile, properties located in the ROZ are subject to no licensing caps— meaning any property owner in the ROZ that wants an STR license can get one.

92. Under the BOCC's projections, the Lower and Upper Blue Basins will drop below the STR cap in 2025, while Snake River and Ten Mile River Basins will not fall below their caps until 2030.

93. Thus, even under the County's overly optimistic estimates, unless a property owner is eligible for Type I "Qualified Occupant" license, it will be years before any owner in the NOZ can even apply for an STR license, let alone get one. And even then few additional licenses will be available. Practically speaking, the vast majority of property owners in NOZ-designated areas—including but not limited to out-of-state residents—can never obtain an STR license under the County's regime.

94. The caps on STR licenses and the carveouts for Qualified Occupants in the NOZ result in discriminatory treatment.

95. For example, SCRH member, Mr. Greg Gutzki ("Mr. Gutzki"), a long-time Summit County resident is ineligible to apply for an STR license just because he is retired.

96. Mr. Gutzki moved to Summit County in 1973 and was a local employee for more than four decades. He worked in the County at hotels and as a general contractor; he also owned a painting company that, among other things, painted ski lifts.

97. Mr. Gutzki owns a home in the Upper Blue Basin, which he personally built. He lives there for at least nine months of the year. The County designated Upper Blue Basin as NOZ.

98. Mr. Gutzki does not currently use his home as an STR, but he would like to.

99. In repeated communications with the County, Mr. Gutzki has inquired about applying for an STR license, including on July 10, 2023.

100. In this latest exchange, the County informed Mr. Gutzki that it is no longer accepting applications for Type II licenses.

101. Mr. Gutzki cannot get a Type I STR license because—as a retiree—he does not meet the criteria of a Qualified Occupant. So under the County's arbitrary STR regime, someone who spent essentially their entire adult life living and working in Summit County cannot obtain an STR license because they are not currently employed fulltime in the County. That does not make sense.

102. Ordinance 20-C's license caps combine with the BOCC's prohibition on the transfer of STR licenses between unrelated sellers and buyers to discriminatorily impact interstate commerce.

103. Ordinance 20-C effectively prohibits non-Colorado residents with properties in the NOZ from engaging in STRs. Non-Colorado residents are, by definition, not Qualified Occupants. They thus are subject to the license caps.

104. For instance, SCRH member Rick Davis ("Mr. Davis") cannot obtain a license to short-term rent his Wildernest property, located in the NOZ, because he is an out-of-state resident.

105. Mr. Davis resides in Texas but spends about four months of the year in Summit County.

106. Mr. Davis and his family have routinely visited Summit County since 1988 to ski and spend time outdoors as a family. In fact, Mr. Davis's sons fell so much in love with Colorado that they moved out to Denver to be closer to the Rocky Mountains. Once Mr. Davis's sons had families of their own, Mr. Davis and his wife decided to buy a home in Summit County where they could host family and be close to their grandkids.

107. Mr. Davis bought his Wildernest home in March 2022.

108. Mr. Davis bought his property with the express intent to use it as an STR. In fact, Mr. Davis used the potential STR income projected by a property management company to secure his Wildernest property mortgage.

109. Before the BOCC passed its STR regulations, Mr. Davis initiated over $80,000 in renovations on his Wildernest home in anticipation of setting it up as an STR. For instance, he

personally replaced the light fixtures and installed modern thermostats, locks, and doorbell cameras. He also bought new living and dining room furniture, put in hardwood floors, and upgraded the kitchen and a bathroom.

110. But Mr. Davis is being denied the right to engage in STRs because his primary residence is out-of-state. Indeed, when Mr. Davis applied for a license, the County denied his application but kept his nearly $800.00 application fee.

111. Unable to rent his home as an STR, Mr. Davis has been renting out his home as a long-term rental ("LTR"). He conservatively estimates renting out his home as an LTR, instead of as an STR, has cost him over $20,000.00. This revenue shortfall has caused him to withdraw thousands of dollars from his IRA to cover his mortgage and other property expenses. This rental income disparity will continue to cost him going forward.

112. If Mr. Davis remains unable to rent his property as an STR, he will be forced to sell it within the next two years.

113. Similarly, Ordinance 20-C's STR license caps in the NOZ and prohibitions on the transfer of STR licenses automatically deny STR licenses to those Summit County property owners who are Colorado residents but do not live in Summit County.

114. For example, SCRH members Stephen and Lisa Wright (collectively, the "Wrights") bought their Summit County property, which is in Peak Seven, in April 2022. They bought the home with the intent to rent it as an STR.

115. The Wrights' primary residence is in Arvada, Colorado.

116. The property owners from whom the Wrights bought their home had an STR license. Yet the County's STR regulations prohibited the transfer of that license.

117. The Wrights did not apply for an STR license because the County expressly told them that, if they applied, they would not receive one and would lose their application fee.

118. The Wrights anticipated engaging in STRs and, without that income, will need to liquidate other assets or use their retirement savings to continue to pay their mortgage.

### c. The County's STR booking limitations are arbitrary and hurt homeowners.

119. Under Ordinance 20-C, all STR license holders in the NOZ are limited to accepting no more than 35 STR bookings per year, as calculated from October 1 through September 30.

120. On information and belief, the BOCC relied on no data or analysis to set the cap at 35 STR bookings per year.

121. The booking limit is an unnecessary impairment of protected property rights in the NOZ, which threatens property owners' livelihoods.

122. For example, SCRH member Tommy Jefferies ("Mr. Jefferies") moved to unincorporated Summit County in 2010 and has lived there fulltime since then. Mr. Jefferies first worked as a Marriott housekeeping manager. Now, in the winter, he drives a snowcat for the Breckenridge Ski Resort and manages a local ski shop. In the summer, he works as a local carpenter.

123. From 2012 to 2017, Mr. Jefferies rented a home in the Silver Shekel area in unincorporated Summit County, which is now designated as NOZ. To help cover his rent, Mr. Jefferies sublet the four unused bedrooms he did not occupy in the home to LTR housemates. But his LTR housemates were rough on the house, and Mr. Jefferies was constantly having to cover the housemates' rent in order to not lose his own housing.

124. After years of hard work, Mr. Jefferies now owns that very home, which he bought from his then-landlord in 2017.

125. Upon buying his home, Mr. Jefferies started hosting STR guests. He had had enough of irresponsible LTR housemates.

126. Since switching his spare rooms to STRs, Mr. Jefferies has had no serious issues with his guests, and he has received zero complaints from his neighbors. In fact, his neighbors have told him they prefer living next to his STR guests as compared to the prior LTR residents.

127. Mr. Jefferies has invested between $150,000 and $200,000, as well as thousands of hours of his labor, in restoring the exterior appearance of his home, interior remodels, and appliance upgrades.

128. Mr. Jefferies has had many more than 35 bookings each year since he began using his home as an STR. In 2018, his very first year as an STR owner, Mr. Jefferies hosted 183 bookings. In 2019, that number grew to 258. Mr. Jefferies hosted 216 and 219 bookings, respectively, in 2020 and 2021, only to have his numbers jump back up to 254 STR bookings in 2022.

129. While many of Mr. Jefferies's STR guests are visiting for just a few days, he also has hosted many individuals in the process of moving to Summit County. His rooms are typically one of the least expensive options for housing. And through his STR profile information, guests can see that he is a well-connected community member who can help them find more permanent housing and jobs. Indeed, Mr. Jefferies has become good friends with many individuals he has met through his STR and helped resettle in the Summit County community.

130. Most SCRH members have averaged more than 35 STR bookings every year. And most SCRH members depend on their STR revenue to pay their property's mortgage.

131. Ordinance 20-C's limitations on the STR bookings that Mr. Jefferies (and similarly situated individuals across unincorporated Summit County) can accept over the course of a year will materially impact his ability to cover his mortgage and property taxes.

132. Because Mr. Jefferies often rents his home's rooms separately, Mr. Jefferies may reach the 35-booking limit *in just a month*. The County's STR regulations, thus, would deprive Mr. Jefferies of 11 months of much-needed STR income. Indeed, Mr. Jefferies believes he will need to sell his home if the County's STR regulations are allowed to stand because he will be unable to afford his mortgage. That would make Mr. Jefferies another local employee needing workforce housing—with the STR regulations being the cause of his housing need. That would be a perverse result.

133. These STR regulations are also likely to have unintended consequences.

134. For example, because Ordinance 20-C defines a booking as "an agreement to rent a unit of a period of less than 30 consecutive days for an exchange of consideration," some SCRH members will be forced to end their partnerships with Advocates for Victims of Assault.

135. Any hosted survivor through Advocates for Victims of Assault for which the homeowner accepts the payment of merely the cleaning fee would count as a booking and thus count against the number of bookings any NOZ STR could host in a year.

136. For some STR homeowners, this change will make the partnership between them and Advocates for Victims of Assault not economically feasible.

**The BOCC's STR regulations are not rationally related to achieving its stated goals.**

137. The BOCC attempts to justify Ordinance 20-C based on the goals below:

a. *Local Workforce Housing*: Maintain the stock that exists for locals, develop regulations that prioritize and preserve long-term rentals and locally owned housing units.

b. *Neighborhood Character*: Create long-lasting STR regulations that preserve the historic, long-term residential character of Summit County's neighborhoods and recognize the differing nature of the resort areas.

c. *Reduce Conflicts*: Identify areas where STRs conflict with the primary residential uses established in the traditional neighborhoods and adopt regulations that reduce impacts and mitigate changes due to STRs.

d. *Balance*: Summit County is a community with abundant resort amenities, long-standing locals' neighborhoods, and is a desirable place for second homeowners; regain the balance between local residents, non-STR second-homes, and STRs.

e. *Clear Regulations*: Adopt regulations that are straight-forward, easy to understand, and easily enforceable.

The problem for the County is that its STR regulations are not rationally related to achieving these goals.

### a. The STR limits in the NOZ will not provide workforce housing.

138. For decades, Colorado resort communities, including Summit County, have been facing workforce housing shortages. This is not a new problem, and STRs are not the cause.

139. In fact, Summit County's 2009 Comprehensive Plan brought up the same issues the County faces today: increasing housing prices and lack of affordable housing.

140. People want to live in Colorado's beautiful mountain communities, but available housing has not kept pace with population growth. For example, between 2010 and 2019, employment rates in Summit, Eagle, Pitkin, Grand, and Routt Counties grew by 17% (or 16,000 jobs), while housing units only grew by 8% (or 8,600 units).

141. Building permits have also not kept pace with job growth in these counties.

142. But an LTR is not a substitute for an STR. So limiting STRs will not help fix the workforce housing shortage.

143. According to a recent rental industry report, when accounting for price and rental availability (meaning the days a home is available for renters), fewer than 4% of the STRs in Summit County, as a whole, are suitable for workforce housing.

144. In addition, the vast majority of owners would not rent their homes as LTRs because of the challenges associated with long-term renters, such as lack of flexibility to spend more personal time at their property, property damage from long-term renters, neighbor or other complaints with long-term renters, and long-term renters failures to pay rent when due.

145. Not only do these homeowners wish to avoid the problems associated with LTRs, but they would also have to put their houses on the rental market at a cost that is too high for most long-term renters to afford.

146. Most homeowners also wish to stay in their own homes much of the year. Nearly 60% of SCRH members report that they personally use their Summit County homes for more than 30 days a year, making them unavailable for most long-term renters.

147. While the BOCC states that it seeks to preserve and grow the number of LTRs available to locals, it does not currently have a system to track the current or historical number of LTR units available similar to that which the County has for STRs.

148. The BOCC's unfounded bias against STRs is further shown by its selective reliance on studies of questionable veracity while ignoring other peer-reviewed studies showing that STRs only have a negligible impact on housing costs and the availability of workforce housing.

149. There is just no rational basis to conclude that limiting STRs will increase LTRs for workforce housing in Summit County.

**b. The BOCC's distinction among ROZ and NOZ areas of Summit County is arbitrary and irrational.**

150. The BOCC claims that the distinction between the ROZ and the NOZ is based on the "character" of the area and that ROZ sections of the County were specifically built for tourism and that they have amenities to support it. For example, the BOCC seems to claim this distinction is based on the wealth of pools, hot tubs, and tennis and pickleball courts in the ROZ areas.

151. But there is no rational distinction between areas classified as NOZ and those classified as ROZ, as many of the NOZ areas are indistinguishable from the ROZ. The whole County is a resort area.

152. For example, while the BOCC classified the Wildernest area as NOZ, a vast portion of the properties there were originally built as ski condos for vacationers, some even in anticipation of Colorado's rejected bid for the 1976 Winter Olympics. These units were not built to be primary residences: they are small and even the largest units often have a loft-style open floorplan for a third bedroom. Many of these properties do not have en-suite laundry, requiring guests go instead to the shared clubhouse. As other evidence of the long-standing practice of STRs, for many years HOAs themselves provided vacation rental property management programs in which property owners could enroll.

153. Similarly, the area the County has designated as the Peak Seven area in the NOZ is at the base of one of the five mountains that comprise the Breckenridge Ski Resort—Peak 7, the very mountain from which the residential area gets its name. Every year, Breckenridge is one of the most visited ski areas in the United States. Peak 7, the mountain, has multiple chairlifts and accommodates abundant guest lodging at its base. The ski area is only a short walk from the Peak Seven NOZ area. Peak Seven is so close to the ski area that avalanche ordinances from the resort

often rattle the windows of area's homes. The ski area, thus, inextricably helps define Peak Seven's resort character.

154. Peak Seven also has world-class hiking, biking, and Nordic ski trails running through the area with guest parking for those trails and snowcat grooming machines located next to homes.

155. While the Grand Lodge at the base of the Peak 7, which can host over 110 bookings a night, is only a short walk from the Peak Seven NOZ area, there is even a lodge located in the supposed neighborhood zone. The High Country Lodge, located in the Peak Seven NOZ, can host upwards of 24 parties overnight and events of up to 150 guests.

156. Despite these resort features, the County designated Peak Seven and Wildernest as NOZ. And these are just a couple of the areas designated NOZ in a resort county.

157. ROZ and NOZ areas are treated the same under the County's commercial and residential zoning regulations. Also, Colorado courts consider STRs residential use. *Houston v. Wilson Mesa Ranch Homeowners Ass'n*, 360 P.3d 255, 259 (Colo. App. 2015); *accord O'Neil v. Conejos Cnty. Bd. Of Comm'rs*, 395 P.3d 1185, 1190 (Colo. App. 2017).

158. Many ROZ and NOZ areas alike have unpaved roads.

159. ROZ and NOZ areas have comparably the same housing density.

160. ROZ and NOZ areas are taxed at the same rates.

161. ROZ and NOZ areas have similar housing stock.

162. The imposition of the NOZ and ROZ zoning thus is arbitrary and irrational.

> **c. No legitimate evidence shows STR regulations will reduce conflicts or that conflicts with STR occupants are greater than conflicts with LTR occupants.**

163. The BOCC claimed that incidences of complaints associated with STRs were relatively higher in the NOZ than in the ROZ.

164. ***Improper analysis***. As an initial point, upon information and belief, the BOCC gave undue influence to the raw volume of complaints it received regarding STRs.

165. On information and belief, the BOCC failed to appropriately analyze the data it received from the complaints. For example, upon information and belief, the BOCC failed to consider whether the complaints were legitimate and truly represented a violation of a local law and neglected to determine whether complaints were duplicates.

166. The County's own communications reveal that, at times, these complaints supported no official action because no regulations (noise or otherwise) were actually violated.

167. But even taking the BOCC's presented complaint data at face value shows that its animus towards STRs is unfounded.

168. For example, between November 2021 and April 2022 (i.e., ski season), at a time when unincorporated Summit County homeowners held over 4,600 STR licenses, the BOCC reported *only 123 total* complaints stemming from STRs.

169. Assuming only 4,600 relevant STR licenses, each with a modest ten bookings over one of the busiest ski seasons in Summit County history, a reported 123 complaints results in a rate of 0.27% of STR bookings having a complaint. So more than 99.7% of STR bookings did not.

170. Even assuming each of the 4,600 STRs had only five bookings over the 2021-2022 ski season, that results in a complaint rate of 0.53%—or 99.5% of STR bookings being complaint free.

171. The BOCC's own data shows that the rate of complaints related to STRs in Summit County is objectively low. It is irrational to think any amount of regulation could bring a violation, let alone a complaint, rate to zero.

172. ***Unreliable baseline***. The BOCC's data does not establish a reliable baseline. The County does not have a collection process similar to STRs for complaints related to LTRs or those for owner-occupied homes.

173. Therefore, the BOCC cannot reliably track the incidents of complaints from LTRs or determine whether LTRs are responsible for many of these complaints.

174. In fact, the BOCC has largely ignored problems associated with LTRs in the NOZ. And yet the BOCC is seeking to increase the number of LTRs in these areas.

175. Thus, the BOCC does not have evidence of how STR complaints compare to complaints stemming from other sources in the community.

176. ***Manipulated survey data to minimize STR supporters.*** The BOCC seemingly manipulated data it collected during a 2022 public survey that sought interested parties' opinions of STRs.

177. On information and belief, the BOCC held the public survey open from June 2022 until early October 2022.

178. The survey asked interested parties to, among other things, rate the impact (whether positive, negative, not discernable, or mixed) of STRs on residential neighborhoods in the County and whether they believed STRs had reduced the number of LTRs in the County.

179. Yet the survey itself allowed respondents to take the survey multiple times. Thus, there was no way of knowing if the survey results accurately represented the sentiments of the County as a whole.

180. Even more critically, on August 29, 2022, an STR-rental company emailed Summit County hosts who operate their STRs through the platform reminding them to complete the survey.

181. After learning of that email, the BOCC—presumably to exclude survey responses spurred by the STR-rental company email that were supportive of STRs—only included survey data received on or before August 30, 2022. In other words, on information and belief, the BOCC purposefully ignored the responses received after that date, but within the announced survey period, to falsely skew the survey results against STRs.

182. In fact, during its meeting held on January 4, 2023, the BOCC was still referencing data from the survey as of August 30, 2022—though the survey was open for at least a month after that date—to support its excessive STR regulations.

183. *Ineffective regulations*. The BOCC relies on no data to show that its limitations on bookings will reduce the incidence of STR complaints in unincorporated Summit County.

184. Limiting STR bookings does not address the problems that the complaints raise.

> **d. The BOCC's desired balance between local residents, non-STR second-homes, and STRs is vague and arbitrary, as evidenced by the similarities between the NOZ and ROZ neighborhoods, as well as the County's tourist-based economy.**

185. Because tourism—an industry with an inherently cyclical nature—is the main driver of the County's economy, there is a substantial inventory of housing units that are needed as vacation or recreational units, rather than as primary residences, to support the influx of visitors.

186. Summit County has about 31,200 housing units, but only 10,600 households, meaning those identifying Summit County as their primary residence.

187. Even with the backdrop of a growing tourism industry, the rates of housing units remaining vacant—in other words, those that are not occupied by permanent residents and thus could be used as an STR—in five Colorado counties, including Summit County, has remained relatively constant over the past ten years. A recent industry study found that the vacancy rate was 48% in 2010 compared to 44% in 2019.

188. This metric suggests that LTRs are not being converted to STRs at a significant rate. Rather, housing that has always been used on a short-term basis is being used to host STR guests.

189.  At bottom, the right to own and rent property is a fundamental right under the United States and Colorado Constitutions. Mr. Ruelle, SCRH members, and others similarly situated have a property interest in the ownership and use of their Colorado properties. The County has violated that right, and its violative STR laws must be voided and enjoined.

### FIRST CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983
### (Violation of Equal Protection under the United States Constitution)

190. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

191. The Fourteenth Amendment to the United States Constitution provides that Equal Protection of the laws shall not be denied to any citizen of the United States.

192. Equal Protection of the law is denied when similarly situated parties are treated differently without a rational basis for such disparate treatment. *City of Cleburne v. Cleburne City Living Ctr.*, 473 U.S. 432, 439 (1985).

193. The STR regulatory framework created by Ordinances 20-B[4] and 20-C, and as further codified in Chapter Four of the County's Land Use and Development Code, treats similarly situated property owners in unincorporated Summit County differently and does not advance a legitimate governmental interest.

194. Those property owners who happen to have bought in what the BOCC is now labeling a "Resort Overlay Zone" may keep renting their homes as they like.

---

[4] The BOCC's website now asserts that Ordinance 20-B has been "Repealed." But Ordinance 20-C expressly references the operative provisions of Ordinance 20-B, and the ROZ and NOZ designations started in Ordinance 20-B. Additionally, Ordinance 20-C's provision on repealing prior ordinances contemplates the partial repeal of a prior ordinance. Thus, to the extent Ordinance 20-B is still operative, Plaintiffs challenge it.

195. Yet homeowners in the "Neighborhood Overlay Zone" are enlisted in the County's misguided attempt to subsidize housing affordability through the BOCC's regulations limiting the uses of their properties.

196. Plaintiff Mr. Ruelle owns a home in the NOZ and thus is subject to the STR limits imposed by Ordinances 20-B and 20-C. He has historically leased his home for STRs free from booking limits but now must comply with the County's limitations.

197. Plaintiff SCRH's members own properties in the NOZ that are subject to the STR limits, including the booking limits and STR license caps. Many, including Mr. Jefferies, have historically leased their properties for STRs free from booking limits. Others wish to obtain STR licenses but cannot under the County's ordinances, including Messrs. Gutzki and Davis.

198. The BOCC's STR regulations that treat similarly situated property owners in the NOZ and ROZ areas differently do not substantially advance a legitimate governmental interest and are arbitrary and irrational. They thus facially violate Mr. Ruelle's and SCRH members' rights secured by the Equal Protection Clause of the United States Constitution.

199. Mr. Ruelle, SCRH members, and other similarly situated County property owners are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

**SECOND CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983**
**(Violation of Equal Protection under the United States Constitution)**

200. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

201. Ordinance 20-C's definition of a "Qualified Occupant" treats similarly situated property owners in unincorporated Summit County differently and thus violates the Fourteenth Amendment's Equal Protection Clause.

202. A homeowner in the NOZ who receives Qualified Occupant status for their property under the BOCC's definition is not subject to the STR license caps, while a homeowner who does not is subject to the caps and thus is ineligible for an STR license.

203.  County residents who pay the same taxes, shop at the same grocery store, and send their children to the same schools receive disparate treatment merely based on the employer for whom they work or whether they have been able to retire.

204. For example, only because Mr. Gutzki has *already* retired, after decades of working in the County, is he not eligible to apply for an STR license.

205. This demarcation of Qualified Occupants and the distinction the STR regulations impose among homeowners with their primary residence in unincorporated Summit County is not rationally related to a legitimate governmental purpose.

206. The BOCC's differential treatment of those who do not qualify as Qualified Occupants violates SCRH members', including Mr. Gutzki's, rights secured by the Equal Protection Clause of the United States Constitution by arbitrarily and irrationally denying equal protection of the law.

207. Ordinance 20-C's definition of a Qualified Occupant, and the resulting differential treatment of those who do not meet that threshold, is facially unconstitutional.

208. SCRH members and others similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

### THIRD CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983
### (Violation of the Dormant Commerce Clause)

209. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

210. A law violates the dormant Commerce Clause if it discriminates on its face against interstate commerce by producing "differential treatment of in-state and out-of-state economic

interest that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). The discrimination may be in the law's purpose or in its effect.

211. That a local ordinance also discriminates against intrastate commerce does not save its constitutionality. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951).

212. Ordinance 20-C's definition of a Qualified Occupant, together with the license caps per basin imposed on Type II licenses in the NOZ, burden interstate commerce and discriminate against out-of-state economic interests.

213. Only in-state-residents can be Qualified Occupants, and only Qualified Occupants can rent STRs under a Type I license. Type I STR licenses are the only STR licenses available in the NOZ. Thus, out-of-state residents, as compared to in-state Qualified Occupants, are ineligible to get a license to operate STRs in the NOZ.

214. Ordinance 20-C burdens interstate commerce through its requirement that a Summit County, Colorado resident be a Qualified Occupant for an STR license.

215. The BOCC's STR regulatory framework does not advance a legitimate public purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *See Dept. of Rev. v. Davis*, 533 U.S. 328, 338 (2008); *see also Hignell-Stark v. City of New Orleans*, 46 F. 4th 317, 328–29 (5th Cir. 2022); *South Lake Tahoe Prop. Owners Group v. City of South Lake Tahoe*, 310 Cal. Rptr. 3d 9 (Cal. Dist. Ct. App. 2023).

216. The BOCC's stated goal of providing local workforce housing could be achieved by, for example, increasing building permits; purchasing existing structures and converting them to affordable housing; providing additional incentives for homebuilders to construct additional

affordable housing; easing deed restrictions, permit fees, and other costs related to adding accessory dwelling units to existing properties; or directly subsidizing local workforce housing.

217. Similarly, the County could reduce conflicts and adequately address complaints related to STRs from neighbors (to the extent this is even a substantial issue) by increasing the County's enforcement efforts, heightening the chance that guests and owners face punishment for unlawful actions.

218. And finally, preserving the neighborhood character and balancing the ratios of local residents, non-STR second home-owners, and STRs is a justification rooted in discriminatory treatment of out-of-state residents and, thus, is not legitimate.

219. Defendants' discriminatory treatment of interstate commerce violates the dormant Commerce Clause, as it burdens out of state interests to the benefit of local residents.

220. The BOCC's STR regulations that discriminate against interstate commerce are thus facially unconstitutional.

221. Therefore, SCRH members, including Mr. Davis, and those similarly situated are entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

### FOURTH CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983
### (Violation of Substantive Due Process)

222. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

223. The Fourteenth Amendment to the United States Constitution provides that no person may be "depriv[ed] of life, liberty, or property, without due process of law."

224. The hallmark of private property is an individual entitlement grounded in law that cannot be removed except for cause.

225. An individual's property rights in land include not only the right to use the property, but also the right to lease it. *Terrace v. Thompson*, 263 U.S. 197, 215 (1923).

226. By limiting the number of bookings an STR owner can accept each year to 35, Ordinance 20-C infringes on the fundamental right to rent private property and violates Mr. Ruelle's and SCRH members' rights to substantive due process.

227. Mr. Ruelle and SCRH members have dedicated resources to improve their homes for their use as STRs. For example, of the SCRH members surveyed, the vast majority have spent substantial amounts improving their properties for STR purposes. For nearly 75% of the properties, SCRH members have spent more than $25,000.00 on improvements, and for nearly 50% of the properties, SCRH members have spent more than $75,000.00 on improvements.

228. And because of the limitations on the number of bookings an STR owner in the NOZ can host, SCRH's members will suffer significant reductions in the revenue obtained from their STRs.

229. Community programs that benefit from STRs will also suffer. For example, as a result of the booking limitations, it will become economically unfeasible for Mr. Ruelle to continue to participate in the lodging match program run by Advocates for Victims of Assault because each time a program participant stays at his home and he collects a nominal cleaning fee, he will be using one of the 35 STR bookings he is allowed. The same goes for him continuing to host Colorado State Patrollers. There will be countless other unintended consequences across the community resulting from the County's ill-conceived regulations.

230. The annual 35 STR-bookings limit is arbitrary and does not substantially advance a legitimate governmental interest.

231. There is no rational basis for the arbitrary cap of 35 STR bookings per year as the cap impedes economic activity in unincorporated Summit County; restricts Mr. Ruelle's, SCRH members', and similarly situated individuals' ability to cover their mortgages or pay other

expenses; and does not result in increased affordable housing for the local workforce nor a decrease in the likelihood of neighbor complaints.

232. The BOCC's yearly 35 STR-bookings limitations, therefore, violates Mr. Ruelle's and SCRH members' right to substantive due process by imposing an arbitrary cap on STR bookings in a year with no rational basis.

233. Ordinance 20-C's STR bookings limitation is therefore facially unconstitutional.

234. Mr. Ruelle, SCRH members, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

**FIFTH CLAIM FOR RELIEF UNDER THE COLORADO CONSTITUTION**
**(Violation of Substantive Due Process)**

235. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

236. The Colorado Constitution provides that "[a]ll persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; *of acquiring, possessing and protecting property*; and of seeking and obtaining their safety and happiness." Colo. Const. art. II, sec. 3 (emphasis added).

237. The Colorado Supreme Court has noted that an "essential element[] of property is the right to its unrestricted use and enjoyment," subject only to what is "*necessary* to provide for the welfare and general security of the public," *Wright v. City of Littleton*, 483 P.2d 953, 954 (Colo. 1971) (emphasis added). Thus, statutes that have "no real or substantial relation to" "the public health, morals, safety, or common welfare . . . and for that reason [are] a clear invasion of the constitutional freedom of the people to use, enjoy or dispose of their property without unreasonable governmental interference," must be declared void by the courts. *Colorado Anti-Discrimination Comm'n v. Case*, 380 P.2d 34, 41 (Colo. 1962). So, under Colorado law, any government regulation of property must be reasonable. *Id.*

238. By limiting the number of bookings an STR owner can accept each year to 35, Ordinance 20-C infringes on the fundamental right to rent private property and violates Mr. Ruelle's and SCRH members' rights to substantive due process.

239. The annual cap on STR bookings is not rationally related to a legitimate government interest nor is it reasonable.

240. The BOCC's yearly 35 STR bookings limitations, therefore, violates Mr. Ruelle's and SCRH members' right to substantive due process by imposing an arbitrary cap on STR bookings in a year with no rational basis.

241. Ordinance 20-C's STR bookings limitation is therefore facially unconstitutional.

242. Mr. Ruelle, SCRH members, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

## SIXTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 30-28-120(1))

243. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

244. Colorado law establishes that the

> lawful use of a building or structure or the lawful use of any land, as existing and lawful at the time of the adoption of a zoning resolution or, in the case of an amendment of a resolution, at the time of such amendment, may be continued, although such use does not conform with the provisions of such resolution or amendment, and such use may be extended throughout the same building if no structural alteration of such building is proposed or made for the purpose of such extension.

245. The use of a property as an STR is a legal nonconforming use that runs with the land. *See Town of Lyons v. Bashor*, 867 P.2d 159, 160 (Colo. App. 1993).

246. Ordinance 20-C's limitations on the number of bookings an STR owner can accept throughout a year violates Colorado's statutory right to the continued nonconforming use of a property as an STR.

247. Before the enactment of Ordinance 20-C, Mr. Ruelle and other SCRH members regularly and lawfully rented out their homes to STR guests for more than 35 STR bookings per year.

248. Indeed, for example, under the 35-booking limit Mr. Jefferies will lose 86% of his bookings compared to the STR guests he hosted in 2022.

249. Mr. Ruelle, Mr. Jefferies, and other SCRH members have not, and need not, make structural alternations to their properties to continue renting them as STRs.

250. By imposing the 35 STR-bookings-per-year limitation, the BOCC is encroaching on a lawful prior use of a structure and land.

251. Therefore, Mr. Ruelle, SCRH members, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of C.R.S. § 30-28-120(1))**

252.  Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

253. The BOCC's prohibition on the transfer of STR licenses upon the sale of a property between an unrelated seller and buyer within unincorporated Summit County also violates Colorado law on the continued nonconforming use of property.

254. At the time Ordinance 20-C was adopted, Mr. Ruelle's and other SCRH members' homes were lawfully used as STRs.

255. Since the passage of Ordinance 20-C, Mr. Ruelle and other SCRH members have not made structural alterations to their homes merely to continue their use as STRs.

256. The lawful use of Mr. Ruelle's and SCRH members' homes as STRs runs with the properties. *See Bashor*, 867 P.2d at 160.

257. But the BOCC's cap on STR licenses together with prohibiting the transfer of STR licenses upon the sale of an STR property, in effect, terminates the lawful nonconforming use of Mr. Ruelle's and SCRH members' properties.

258. Therefore, the restriction on the transfer of STR licenses upon the sale of a property within unincorporated Summit County together with the caps on STR licenses per basin violates Colorado statutory law.

259. Mr. Ruelle, SCRH members, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

## EIGHTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 38-1-101(3)(a))

260. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

261. Colorado statutory law provides that "[n]otwithstanding any other provision of law to the contrary, a local government shall not enact or enforce an ordinance, resolution, or regulation that requires a nonconforming property use that was lawful at the time of its inception to be terminated or eliminated by amortization." C.R.S. § 38-1-101(3)(a).

262. Mr. Ruelle's and other SCRH members' renting out of the Summit County properties as STRs is a legal nonconforming use.

263. By jointly enacting the STR license caps for Type II licenses under Ordinance 20-C and prohibiting the transfer of STR licenses upon the sale of a property in the NOZ areas of unincorporated Summit County, the BOCC is, in effect, eliminating by amortization a lawful nonconforming use—the rental of a property as an STR.

264. Because a property's exemption as a prior nonconforming use runs with the land, *Bashor*, 867 P.2d at 160, the prohibition on transferring any lawful NOZ STR license upon the sale of a property violates Colorado's statutory protections of non-conforming uses in that the new owner

will not be eligible to apply for and obtain a Type II STR license to continue that lawful nonconforming use.

265. In effect, the BOCC is unlawfully using the current owner's continued use of the STR license before sale of the property as a period of amortization, after which the provisions of Ordinance 20-C terminate the lawful nonconforming use.

266. Therefore, Mr. Ruelle, other SCRH members, including the Wrights, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

### NINTH CLAIM FOR RELIEF
### (Violation of § 38-1-101(3)(a))

267. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

268. Ordinance 20-C likewise violates Colorado's prohibition on the enactment or enforcement of ordinances that terminate a legal nonconforming use through its imposition of the 35 STR-bookings-per-year limitation for each property within the NOZ.

269. Before Ordinance 20-C, STR owners lawfully accepted as many bookings year-round as their homes could fit, subject to occupancy standards and to the owners' desires to spend time at their homes.

270. Ordinance 20-C unlawfully restricts this prior usage as it terminates an STR homeowner's ability to determine, within the occupancy limitations, the number of bookings the owner needs or wants for the year.

271. Therefore, Mr. Ruelle, other SCRH members, and those similarly situated are thus entitled to the declaratory and injunctive relief requested in the Prayer for Relief below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs ask the Court to enter judgment in its favor and against Defendants and to order the following relief:

a.  A declaration that Summit County Ordinance 20-B's distinction between the Resort Overlay Zone and Neighborhood Overlay Zone and the corresponding differential regulation of private property is unconstitutional on its face, rendering it void;

b.  A declaration that Summit County Ordinance 20-B's definition of a "Qualified Occupant" and the corresponding differential regulation of private property is unconstitutional on its face, rendering it void;

c.  A declaration that Summit County Land Use and Development Code's distinction between the Resort Overlay Zone and Neighborhood Overlay Zone in Chapter Four and the corresponding differential regulation of private property is unconstitutional on its face, rendering it void;

d.  A declaration that Summit County Ordinance 20-C's caps on the number of bookings any Short Term Rental in the NOZ may be rented during a year is unconstitutional on its face, rendering it void;

e.  A declaration that, under Colorado law, Ordinance 20-B's and 20-C's booking limitations, prohibition on the transfer of Short Term Rental licenses, and caps on the number of STR licenses, as enforced against homeowners who were lawfully renting their properties as Short Term Rentals, are unlawful, and thus homeowners who have been renting their properties as Short Term Rentals may continue to do so unimpeded as legal nonconforming uses that run with the land;

f.  A declaration that, under Colorado law, Ordinances 20-B's and 20-C's booking limitations, prohibition on the transfer of Short Term Rental licenses, and caps on the number of STR licenses, as enforced against homeowners who bought their residential properties in the County during the period that Ordinances 20-B or 20-C were in effect and where the prior owners operated the property as a Short Term Rental, are unlawful, and thus homeowners whose properties have been rented as Short Term Rentals may continue to do so unimpeded as legal nonconforming uses that run with the land;

g.  A permanent injunction prohibiting Defendants from violating any provision of the United States or Colorado Constitutions or Colorado Statutes, including, but not limited to, undertaking or authorizing the enforcement of Ordinances 20-B's and 20-C's (1) differential treatment of Short Term Rental owners within Summit County based on Qualified Occupant status; (2) discriminatory treatment of out-of-state homeowners; (3) limitations on the number of bookings Short Term Rental owners may accept during a year; (4) limitations on the number of Short Term Rental licenses in the County and denial of new licenses under the basin caps; and (5) prohibition on the transfer of STR licenses;

h.  An award in Plaintiffs' favor and against Defendants for Plaintiffs' reasonable expenses, including attorneys' fees and costs under 42 U.S.C. § 1988, incurred as a result of prosecuting this case; and

i.  Any and all other relief that the Court deems just and proper.

Respectfully submitted this 14th day of August, 2023.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:    *s/ Matthew C. Arentsen*

Matthew C. Arentsen, Bar No. 45021
Justin L. Cohen, Bar No. 44811
Wayne F. Forman, Bar No. 14082
Rosa L. Baum, Bar No. 56652
675 15th Street, Suite 2900
Denver, CO 80202
Telephone:  303.223.1100
Fax:  303.223.1111
Email:  marentsen@bhfs.com
        jcohen@bhfs.com
        wforman@bhfs.com
        rbaum@bhfs.com

*Attorneys for Plaintiffs*